RICHARD KEPPLER, executor, *vs.* ROBERT D. TUFTS
& another.[1]

No. 93-P-1623.

Essex. February 13, 1995. - May 23, 1995.

Present: KASS, SMITH, IRELAND, JJ.

*Medical Malpractice*, Standard of care. *Negligence*, Doctor, Standard of
care, Proximate cause. *Proximate Cause.*

A medical malpractice tribunal correctly concluded that a plaintiff's offer
of proof as to one physician's omissions in failing to order X-rays or
follow-up treatment [589-590] and as to another physician's eight-week
delay in diagnosis of the patient's cancer [591-592] was insufficient to
warrant further judicial inquiry where the evidence did not show that
the patient more likely than not had been caused injury thereby.

CIVIL ACTION commenced in the Superior Court Depart-
ment on October 1, 1991.

The case was heard by *John T. Ronan*, J., and entry of
separate and final judgment was ordered by *Howard J.
Whitehead*, J.

*Paul F. Denver* for the plaintiff.
*Kenneth R. Kohlberg* for Roger Michaud.
*Richard M. Haley* for Robert D. Tufts.

IRELAND, J. The plaintiff appeals from a final judgment
dismissing a wrongful death medical malpractice action
against the defendants. A medical malpractice tribunal, con-
vened pursuant to G. L. c. 231, § 60B, reviewed the suffi-
ciency of the plaintiff's offer of proof as to these defendants,
and concluded that the plaintiff's evidence, if properly sub-
stantiated, was insufficient to warrant further judicial in-

---

[1]Roger Michaud.

quiry.[2] The plaintiff failed to post the bond required by c. 231, § 60B, and, accordingly, the two defendants were dismissed from the action, with final judgment entered September 29, 1993. We affirm the judgment.

The action concerns the medical treatment given the plaintiff's late wife, Katherine Keppler, who died of lung cancer on August 29, 1989. Dr. Michaud, a general practitioner, saw Mrs. Keppler two times, on January 23, 1988, and on April 9, 1988, at Hunt Hospital, where she had presented at the outpatient department with complaints of a persistent cough and chest congestion. Dr. Michaud was made aware that the patient was a long-time chronic smoker. On the first visit, Michaud ordered a chest X-ray which, according to the radiologist's report, revealed a "normal chest." Michaud diagnosed the patient's condition at that time as acute bronchitis. At the April 9 visit, Michaud did not order a second X-ray. A diagnosis of viral syndrome was noted in the record on that date.

Dr. Tufts, a pulmonary specialist, treated Mrs. Keppler between November 28, 1988, and late January, 1989, for continuing cough and chest congestion, diagnosed as acute bronchitis by another referring doctor from Beverly Hospital. Like Dr. Michaud, Dr. Tufts knew the patient had a history of chronic smoking. Tufts reviewed several X-rays of the patient taken during the course of her treatment by him, which revealed a two centimeter nodularity[3] of uncertain diagnosis on her right lung. Tufts also ordered other tests, including two CT scans[4] of Mrs. Keppler's lung and a bronchoscopy.[5]

---

[2] The tribunal found sufficient evidence to raise questions of liability against two other defendants, Dr. Anthony Patton and Dr. Richard McManus, who were also named in the complaint.

[3] Derived from "nodulus," defined in anatomical nomenclature "as a general term to designate a comparatively minute collection of tissue." Sloane-Dorland Annotated Medical-Legal Dictionary 501 (West 1987).

[4] "A diagnostic procedure used to produce a series of cross-section images of internal body parts." CT stands for "computerized tomography." Sloane-Dorland 536 (West Supp. 1992).

[5] Examination of the bronchi through a bronchoscope. The procedure allows for a visual inspection of the main bronchial tubes. When fitted with

Throughout the period Tufts treated Mrs. Keppler, he also maintained her on a regimen of antibiotics.

*Discussion*

1. *Claims against Dr. Michaud.* The thrust of the complaint against Dr. Michaud is that he departed from acceptable medical practice in failing to order a follow-up X-ray on April 9, 1988, when Mrs. Keppler's symptoms persisted; and in not prescribing further treatment for her complaints. As an offer of proof before the tribunal, the plaintiff submitted Mrs. Keppler's medical records and a report from Dr. Martin E. Katz, an oncologist,[6] which states in pertinent part that, had Michaud ordered a subsequent X-ray, it "would have evidenced the lung cancer."

The role of the medical malpractice tribunal in evaluating the sufficiency of the plaintiff's offer of proof is likened to a trial judge's evaluation of a motion for a directed verdict. *Little* v. *Rosenthal*, 376 Mass. 573, 578 (1978). *Kulas* v. *Weeber*, 20 Mass. App. Ct. 983, 983 (1985). Under the *Little* directed verdict standard, the plaintiff's offer of proof was entitled to prevail if: (1) a doctor-patient relationship was shown; (2) there was evidence of the doctor's departure from good medical practice; and (3) damage resulted therefrom. *Kapp* v. *Ballantine*, 380 Mass. 186, 193 (1980). The evidence presented is to be viewed "in a light most favorable to the plaintiff," *Blake* v. *Avedikian*, 412 Mass. 481, 484 (1992), and the tribunal may not examine its weight or credibility. *Perez* v. *Bay State Ambulance & Hosp. Rental Serv., Inc.*, 413 Mass. 670, 676 (1992). An offer of proof, however, "must comprise more than mere conclusory allegations. . . ." *Booth* v. *Silva*, 36 Mass. App. Ct. 16, 20 (1994).

Applying these standards, we find Dr. Katz's opinion that Dr. Michaud departed from acceptable medical practice in not ordering an X-ray in April, 1988, and in not prescribing follow-up treatment to be based on more than speculation or

---

surgical instruments, the bronchoscope can be used to obtain tissue samples for biopsies. Sloane-Dorland 100 (West 1987).

[6]A specialist in the field of tumors. Sloane-Dorland 508 (West 1987).

"conclusory allegations," *Booth* v. *Silva, supra* at 20. As such, the offer of proof as to negligence, element (2) above, see *Kapp* v. *Ballantine*, 380 Mass. at 193, is miminally suffi- cient to survive a motion for directed verdict. With regard to causation, element (3) above, it was the plaintiff's duty, given Mrs. Keppler's ultimate diagnosis of incurable cancer to show that the "alleged negligence of [Dr. Michaud] was more probably than not a cause of the loss of a substantial chance to survive." *Bradford* v. *Baystate Med. Ctr.*, 415 Mass. 202, 209 (1993). See also *Cusher* v. *Turner*, 22 Mass. App. Ct. 491, 498 (1986) (citing *Glicklich* v. *Spievack*, 16 Mass. App. Ct. 488, 495 [1993], in applying a similar stan- dard of causation when ruling on a motion for judgment not- withstanding the verdict in a medical malpractice case, where the plaintiff was diagnosed with ovarian cancer which had spread throughout her body). We find Dr. Katz's opinion that, had an X-ray been ordered on April 9, 1988, cancer would have been detected was speculative and amounted to little more than "conclusory allegations." Mrs. Keppler's cancer was not detected until January, 1989, nine months af- ter Dr. Michaud last saw her. During that period, she under- went several additional chest X-rays and two CT scans, none of which was positively interpreted at the time as showing cancer.[7] The offer of proof that Dr. Michaud's omissions in failing to order a follow-up X-ray or follow-up treatment more likely than not caused further injury to Mrs. Keppler was insufficient, and the medical tribunal correctly so ruled.[8]

---

[7]It was not until January 18, 1989, during the course of a bronchoscopy and needle aspiration biopsy, that the cancer was positively identified as a "poorly differentiated adenocarcinoma."

[8]Compare with *Rahilly* v. *North Adams Reg. Hosp.*, 36 Mass. App. Ct. 714 (1994), where the offer of proof established evidence of a causal nexus between the defendant pediatrician's failure to order an immediate CT scan on an unconscious and unresponsive infant, and the infant's death five days later from intracranial hemorrhage and anoxic brain damage. Here, by contrast, Dr. Michaud did not face an obvious life-threatening emer- gency, and he had before him the radiologist's reading of the January 23, 1988, X-ray which showed "a normal chest." Nowhere does the offer of proof suggest that Michaud's reliance on that reading, or failure to inde- pendently examine the X-ray himself, fell below acceptable medical stan-

2. *Claims against Dr. Tufts.* Mrs. Keppler was under Dr. Tufts' care for an approximate eight-week period between late November, 1988, and January, 1989, during which time Dr. Tufts did not positively identify the lung cancer. The cancer was finally identified through a needle aspiration biopsy conducted January 18, 1989. See note 7, *supra.* In his offer of proof, the plaintiff submitted Dr. Katz's expert opinion, in the form of a letter, which asserted that Dr. Tufts' failure "to expeditiously diagnose and treat Mrs. Keppler's cancer increased the risk of metastases, militated against her chances of survival, lessened her life expectancy, and contributed to her pain, suffering, and morbidity."[9]

It was the plaintiff's duty before the tribunal to present evidence sufficient under the *Little* standard to show that any delay on Dr. Tufts' part in diagnosing Mrs. Keppler's cancer was causally related to the metastasis of her cancer, and to her ultimate death from that disease. Stated a different way, Dr. Katz's expert opinion would have had to show that Dr. Tufts' negligence was "more probably than not a cause of the loss of a substantial chance to survive," *Bradford* v. *Baystate Med. Ctr.,* 415 Mass. at 209, or that, had he properly diagnosed Mrs. Keppler's disease, then, "to a reasonable medical certainty, [she] would not have had [metastasis of

---

dards. Furthermore, taking the evidence in the light most favorable to the plaintiff, an X-ray taken in April, 1988, would likely have shown the same lesion or nodularity on the patient's lung which showed up in subsequent X-rays and CT scans, but which was not positively identified at the time as cancerous. By contrast, in *Rahilly,* the intracranial bleeding, from which intracranial pressure can be anticipated, was immediately detected in a CT scan belatedly taken some seven or eight hours later.

[9]Dr. Katz opined that Dr. Tufts' failure to obtain the original January 23, 1988, X-ray fell below acceptable standards of medical care. Under careful scrutiny, that X-ray, according to Dr. Katz, showed "a suspicious area in the right upper lobe" of Mrs. Keppler's lung. According to Dr. Katz, a comparison of that X-ray with one taken November 27, 1988, which revealed a 2 centimeter lesion or nodularity in the same area, "should have strongly suggested . . . evidence [of] cancer given the fact that the lesion was present in January, 1988, and progressive on the November 27, 1988, chest X-ray." From that, Dr. Katz concluded that Dr. Tufts should have ordered the biopsy procedure sooner and, thus, the cancer would have been positively identified earlier in his treatment of Mrs. Keppler.

her cancer] and would have had a much improved chance of survival or longer life . . . " (brackets in original). *Cusher* v. *Turner*, 22 Mass. App. Ct. at 498. The record that was before the tribunal, however, is barren of any evidence to suggest beyond pure conjecture or speculation that Mrs. Keppler's cancer extended to other parts of her body, or progressed to a more advanced stage between November 28, 1988, when she first came under Dr. Tufts' care, and January 18, 1989, when the biopsy revealed a cancerous growth on her lung. Compare *Cusher* v. *Turner*, *supra* at 497-498 (three-year delay on defendant doctor's part in diagnosing and treating patient's cancer proximately caused metastasis of cancer leading to patient's death).

The plaintiff's offer of proof was insufficient, as no evidence was presented to indicate "more probably than not," *Bradford* v. *Baystate Med. Ctr.*, *supra* at 209, that Mrs. Keppler "would have lived longer or suffered less," *Murphy* v. *Conway*, 360 Mass. 746, 750 (1972), had Dr. Tufts diagnosed and treated her cancer between mid-November, 1988, and mid to late January, 1989. The tribunal's determination was not in error, and the resulting judgment dismissing the plaintiff's claim against Dr. Tufts was proper.

*Judgment affirmed.*